Kathryn S. Diemer
Diemer & Wei, LLP
100 West San Fernando St. Ste. 555
San Jose, CA 95113
P: 408-971-6270
F: 408-971-6271
kdiemer@diemerwei.com

Phillip A. Bock (pro hac vice to be requested)
Daniel J. Cohen (pro hac vice to be requested)
Molly S. Gantman (pro hac vice to be requested)
Bock, Hatch, Lewis & Oppenheim, LLC
134 N La Salle St. Ste. 1000
Chicago, IL 60602
P: 312-658-5500
F: 312-658-5555

Ilan Chorowsky (pro hac vice to be requested)
Mark Bulgarelli (pro hac vice to be requested)
Adam Urbanczyk, *Of Counsel* (pro hac vice to be requested)
Progressive Law Group, LLC
1570 Oak Ave., Ste. 103
Evanston, IL 60201
P: 312-787-2717
F: 888-574-9038

Counsel for Plaintiff Tony Kramer and proposed class

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| TONY KRAMER, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC.<br><br>    Defendant. | Case No.:<br><br>**CLASS ACTION**<br><br>COMPLAINT FOR BREACH OF CONTRACT, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING, ACCOUNTING, AND VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.<br><br>**JURY TRIAL DEMANDED** |

NOW COMES Plaintiff Tony Kramer, individually and on behalf of all others similarly situated, by and through counsel, and, upon personal knowledge as to facts known to Plaintiff, and as to all other facts upon information and belief following investigation of counsel, alleges as follows against Defendant Facebook, Inc. ("Facebook"):

## INTRODUCTION

1.      Facebook sells advertising space on its social media platform by offering access to its users.  This case seeks relief for Plaintiff and similarly situated "Advertisers" who purchased cost-per-click ("CPC") or cost-per-impression ("CPM") advertisements ("Ads") displayed to users throughout Facebook's social network including, without limitation, the Facebook mobile application ("Mobile App").

2.      The target audience of Facebook's advertising is, of course, its users.  Most users browse Facebook's platform using the Mobile App and, therefore, most advertising spending on Facebook targets Mobile App users (as opposed to those accessing the Facebook website with a desktop or laptop computer).

3.      Facebook advertisers who pay on a CPM basis pay a fee each time their Ad is published on Facebook's platform, regardless of whether any Facebook user clicks on their Ad. Advertisers who pay on a CPC basis pay a fee each time their published Ad is clicked by a Facebook user.  CPM and CPC Ads together comprise the vast majority of Facebook's advertising revenue.

4.      An Advertiser agrees to pay Facebook money to run a CPM or CPC advertising campaign, and Facebook debits the Advertiser's account as the Ads are published or clicked.

5.      For a CPC Ad, Facebook debits money from the Advertiser's account on a per-click basis, according to Facebook's internal record of clicks and the predetermined per-click rate. Thus, when a Facebook user clicks on a CPC Ad published on the Mobile App, Facebook records the click and debits the Advertiser's account accordingly.

6.      In addition to debiting Advertisers for CPC Ad clicks initiated by Mobile App users – and unbeknownst to Advertisers, or Mobile App users to whom the CPC Ad is published – Facebook itself clicks on CPC Ads and charges those clicks to Advertisers.

7.     Through a practice of counting its own pre-fetch clicks as "clicks," Facebook has systematically inflated its *charges* for CPC Ads, and systematically inflated the *data metrics* it reports to Advertisers about how many times Facebook users have engaged their Ads.

8.     Plaintiff calls these pre-fetch clicks, "Stealth Clicks." Facebook does not inform Advertisers that it is charging, and they are paying, for Stealth Clicks.

9.     Stealth Clicks work by way of the Mobile App.  The Mobile App is programmed to send coded requests to visit internet links embedded in published Ads.  The coded requests act as clicks and Facebook counts them as chargeable clicks, even though no Mobile App user has engaged, initiated, or tactilely clicked the Ad.

10.     Simultaneously, Facebook gives Advertisers valuable data analytics summaries of the number of clicks and engagements with CPC and CPM Ads.  Facebook provides link click performance data to Advertisers.  This data drives Advertiser decision making and, thus, increases Facebook's Ad revenue. By including Stealth Clicks in the count, Facebook artificially inflates and misrepresents the results.

11.     Plaintiff requests the Court award the following relief to Plaintiff and other Advertisers: (i) stop Facebook from continuing its Stealth Click data commingling and charging practice; (ii) require Facebook to provide an accounting for its Stealth Click charging practice; (iii) require Facebook refunds for Stealth Click charges; (iv) require Facebook to properly disclose its practice in its terms of service and data analytics going forward; and (v) award restitution and damages available under applicable law.

## PARTIES, JURISDICTION AND VENUE

12.     Plaintiff is a citizen of the State of Minnesota.

13.     Facebook is a Delaware corporation with its principal place of business in California.  Facebook created, marketed and administered advertising offerings at issue in this case, and perpetrated its herein alleged conduct, through its officers, agents, offices and/or employees in California.

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) Plaintiff Tony Kramer is an individual and resident of the State of Minnesota; (ii) Defendant is a

resident of the State of California; and (iii) based on the total value of the claims and relief sought by Plaintiff individually and on behalf of the Class, the total amount in controversy exceeds $5,000,000.  The proposed Class numbers in excess of 100 persons.

15.     Venue is proper before the Court pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, Defendant resides in this judicial District, and a substantial part of the events or omissions giving rise to the claims occurred here.

16.     Facebook's standardized contract terms provide that disputes are to be governed by California law and raised in this judicial venue, and Facebook and the Advertisers are subject to the personal jurisdiction of the Court.

## FACTUAL ALLEGATIONS

17.     Facebook is an advertising business. Facebook is the world's largest social network, with more than 1.40 billion daily active users and 2.13 billion monthly active users.[1] Facebook employs this social network to sell advertising.

18.     Facebook reported $26.885 billion in advertising revenue for 2016, representing 97.275% of all of Facebook's revenue and a 57% increase over 2015.[2]

19.     Facebook reported nearly $39.942 billion in advertising revenue for 2017, representing 98.251% of all of Facebook's revenue and a 49% increase over 2016.[3]

20.     Facebook's sale of Ads on the Mobile App represents the vast majority of its overall revenue.[4]

---

[1] https://investor.fb.com/investor-news/press-release-details/2018/facebook-reports-fourth-quarter-and-full-year-2017-results/default.aspx, last accessed May 24, 2018.

[2] https://investor.fb.com/investor-news/press-release-details/2017/Facebook-Reports-Fourth-Quarter-and-Full-Year-2016-Results/default.aspx, last accessed May 24, 2018.

[3] https://investor.fb.com/investor-news/press-release-details/2018/facebook-reports-fourth-quarter-and-full-year-2017-results/default.aspx, last accessed May 24, 2018.

[4] Felix Richter, *Facebook's Growth Is Fueled by Mobile Ads* (Feb. 1, 2018), available at https://www.statista.com/chart/2496/facebook-revenue-by-segment/, last accessed May 24, 2018.

**How Facebook CPC and CPM Advertising Works**

21.     For a CPC Ad, Facebook charges an Advertiser a fee based upon, *inter alia*, the stated "cost per click" for the relevant billing period, multiplied by the number of clicks Facebook counts or registers for that CPC Ad.

22.     For a CPM Ad, Facebook charges an Advertiser a fee based upon, *inter alia*, the stated "cost per impression" for the relevant billing period, multiplied by the number of user views Facebook registers for that CPM Ad.

23.     Facebook allows Advertisers to choose parameters for their Ad campaigns, but within those parameters Facebook decides when and to whom it publishes the Ads.

24.     CPC Ads published on the Facebook platform by Plaintiff and other Advertisers commonly include embedded hyperlinks. When a Facebook user clicks a CPC Ad, the user is directed to the Advertiser's desired location—*e.g.*, the Advertiser's web page at which the user may view or purchase advertised products or services.

25.     An Advertiser can create a CPC or CPM Ad through the "Ad Manager" tool connected to a personal or business profile within Facebook's network, and have a credit card or other payment instrument ("Payment Instrument") registered with the Advertiser's account with Facebook.

26.     Facebook permits Advertisers to set an Ad budget ("Ad Budget") and a schedule during which the Ad may be displayed to Facebook users.

27.     The Ad Budget is the amount of money an Advertiser is willing to pay for Facebook users manually clicking on the Advertiser's CPC Ad or viewing the Advertiser's CPM Ad.

28.     For CPC Ads, Facebook records clicks using its own "back end" technology, which it does not make available to Advertisers.  For each time a user clicks on Advertiser's CPC Ad, Facebook debits the Advertiser's Ad Budget by the associated cost-per-click amount imposed by Facebook.

29.     For CPM Ads, Facebook records user views using its own "back end" technology, which it does not make available to Advertisers.  Each time a user views an Advertiser's CPM Ad, Facebook debits the Advertiser's Ad Budget by the associated cost-per-impression imposed by Facebook.

30.     When the Ad Budget is exhausted, or alternatively if the Ad Budget isn't exhausted but the Advertiser's run time for the Ad has ended, the CPC Ad is no longer displayed to Facebook users.  Periodically, Facebook will automatically debit the Advertiser's Payment Instrument for the cost of clicks Facebook records during the period.

31.     As part of Facebook's advertising service that CPC and CPM Advertisers pay for, Facebook provides Plaintiff and other Advertisers with valuable Ad statistics through, among other things, Facebook's "Ad Manager," itemizing the Advertiser's CPC or CPM Ad and associated data, such as chronicles of click performance, Ad impressions, Ad costs-per-click and costs-per-impression, and amounts charged to the Advertiser for the CPC Ad clicks and CPM Ad views. Advertisers rely upon those Facebook-reported statistics in making decisions about advertising on Facebook.

32.     Some CPM Ads contain Ad links, just like CPC Ads, which enable users to click on a link, for example, that takes them to the Advertiser website. For both CPC Ads and CPM Ads with an Ad link, Facebook Ad metrics inform Advertisers about the performance or number of link clicks.

**Facebook's Use of the Mobile App and Stealth Click Charges**

33.     Ads may be displayed to Facebook users through an internet web browser or via the Mobile App.  The Mobile App is a Facebook software application that may be downloaded and utilized by Facebook users on Apple iOS or Android mobile devices.

34.     Facebook users using an internet web browser can navigate Facebook pages, advertisements, and other content. A Mobile App user can also navigate the same Facebook pages and advertisements.

35.     When a Mobile App user clicks on a CPC Ad, Facebook charges the Advertiser the cost-per-click for that Ad.

36.     Plaintiff alleges that the Mobile App itself causes Stealth Clicks to be registered against Ads appearing on a Mobile App user's device screen—while the user is navigating Facebook pages and advertisements thereon (*e.g.*, by scrolling through the Mobile News Feed)—without and even though the user has not performed a manual click function (*e.g.*, screen tap to visit the Advertiser's page). Without access to Facebook's back-end technology through discovery, it is impossible for Plaintiff to understand precisely why, how, and when Facebook counts and charges for Stealth Clicks.

37.     Facebook registers a Stealth Click when Facebook's software code in the Mobile App instructs it to perform HTTP GET requests—automatically, in the background, and invisibly—to hyperlinks embedded in posts viewed by the Mobile App user, including links contained with Ads.

38.     An HTTP GET request is a hypertext transfer protocol ("HTTP") function that requests data from a specified resource, such as an Advertiser's website hyperlinked within an Ad.

39.     If a Mobile App user clicks a hyperlink within an Ad displayed on the user's mobile device screen, the Mobile App will send an HTTP GET request to the hyperlinked resource and register a proper cost-per-click charge.

40.     Importantly, the Mobile App autonomously sends HTTP GET requests to resources hyperlinked within an Ad, and those requests are or routinely may be registered as clicks, even though no Mobile App user has clicked the Ad.  Facebook debits these Stealth Clicks against the Advertiser's Ad Budget and charges the Advertiser's Payment Instrument for Stealth Clicks.

41.     At relevant times, Facebook programmed the Mobile App to "pre-fetch" content it believes the user may consume or view next using HTTP GET requests which can create the Stealth Clicks at issue here.  By way of example, when a user navigates through content on the Mobile App, the Mobile App, prior to the user initiating any activity, commonly implements rules to pre-load resources (*i.e.*, pre-fetch) to which elements on the viewed page link into the Mobile App's cache, allowing for those resources to be more quickly loaded and displayed to the user in the event the user desires to click on those links.  In this way, where a page contains Ads with

hyperlinks, the resources to which those hyperlinks points are pre-fetched and the Ad is charged with a Stealth Click.

42.    Facebook labels pre-fetched clicks with a data trail that identifies a hyperlink as having been pre-fetched, or clicked, by Facebook itself and not by a user or third-party. Nevertheless, pre-fetched Stealth Clicks are charged to the Advertiser's Ad Budget and ultimately debited against the Advertiser's Payment Instrument.

43.    Unlike actual clicks by users engaging an Ad, the Mobile App's Stealth Clicks do not result in any visible change on a user's screen (*e.g.*, a web browser window opening up to the Advertiser's website).  Rather, the Stealth Clicks merely manifest as HTTP GET requests which occur in the background, hidden from the Mobile App user's view.

44.    Effectively, a Stealth Click is not a "click" by a user and no user has seen or engaged the linked internet page or business profile to which the Ad was linked and to which the Advertiser desired to drive traffic.

45.    Facebook imposes CPC charges for Stealth Clicks while users navigate Facebook pages and Ads (*e.g.*, by scrolling through the Mobile News Feed) but without the user performing tactile or manual click functions (*e.g.*, screen tap) or otherwise demonstrating any engagement that would be counted as a "click." Facebook charges Advertisers for Stealth Clicks even though they do not represent an actual user clicking or engaging their Ads.

46.    Plaintiff and other Advertisers have paid for Stealth Clicks which: (a) were not triggered by a user actively engaging the Advertiser's Ad; and (b) did not otherwise present the target user with the linked resource, such as the Advertiser's website.

47.    Facebook does not tell Advertisers about Stealth Click charges or that it charges Advertisers for such activity.

48.    Facebook has improperly charged and collected money from Advertisers for Stealth Clicks generated by Facebook's Mobile App.

49.    Ad data and billing information that Facebook shares with Plaintiff and other Advertisers includes but does not discretely identify Stealth Clicks or charges therefor, nor do

Stealth Clicks signal to the Mobile App user that a "click" has occurred, making it virtually impossible for an Advertiser to know that it has been charged for them.

50.     Moreover, merely clearing the cache on a user's mobile phone may result in *repeated* Stealth Clicks as Facebook again automatically pre-fetches the same hyperlinks embedded in the same Ads.

## Plaintiff's Experience

51.     Plaintiff placed numerous CPC Ads that were published on the Mobile App at relevant times. These Ads, and the associated data Facebook provided, were subject to Facebook's undisclosed and improper practice of charging and debiting money for Stealth Clicks and providing accordingly-corrupted data and analytics for the Ads.

52.     At such times, including between August 2016 and the present, Plaintiff placed numerous CPC Ads and, per the above-described practice, unknowingly paid for Stealth Clicks. Plaintiff read and relied upon analytics data Facebook provided to make advertising decisions, including at relevant times when the above-described Stealth Click practice was in place.

53.     For example, Plaintiff purchased a CPC Ad campaign that ran from November 25 to November 26, 2016, for his Hoversafe business. Facebook charged him and debited his Payment Instrument (his credit card) for 135 Facebook platform link clicks, including, per Facebook's practice, Stealth Clicks.

54.     As a result, Plaintiff paid money for pre-fetch Ad clicks that were autonomously initiated by Facebook's Mobile App itself.

## Harms Resulting from Facebook's Actions

55.     Facebook states that it "cannot control how clicks are generated on your ads,"[5] meaning Facebook's controlled Stealth Clicks are not "clicks," but Facebook has programmed its Mobile App to make/register Stealth Clicks and Facebook charges for them.

---

[5] Self-Serve Ads Terms, available at https://www.facebook.com/legal/self_service_ads_terms, last accessed May 13, 2018.

56.     Advertisers pay money for Ad clicks only because they intend for actual, potential customers – *i.e.*, human Facebook users – to generate the clicks. Certainly, they do not intend to pay for Facebook's automated pre-fetch, Stealth Clicks.

57.     Intentionally or not, Facebook has utilized its Mobile App in such a way as to artificially inflate charges levied against Advertisers and inflate and otherwise corrupt data regarding Ad campaigns so as to misrepresent overall Ad performance.

58.     Facebook does not inform Advertisers that some clicks are generated by the Mobile App itself, not human Facebook users or even third-party "bot" malware, and that Facebook charges for those Stealth Clicks.

59.     Stealth Clicks are counted against Advertisers' Ad Budgets, and Advertisers are charged for link clicks that do not actually occur.

60.     As a direct result of Facebook's actions, Advertisers have been damaged by, for example, being charged for and paying monies for services that Facebook did not provide, and by reading and digesting Ad metrics from Facebook that inflates Ad campaign performance results.

## CLASS ALLEGATIONS

61.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action as a class action, on behalf of himself and the following presently defined Class and Subclass:

    a.   Class: all persons and businesses who purchased, from Facebook, a CPC Ad, or a CPM Ad containing an Ad link, for publication on Facebook.

    b.   Subclass: all persons and businesses who purchased, from Facebook, a CPC Ad for publication on Facebook, at times when Facebook charged for Ad clicks autonomously generated by the Facebook Mobile App.

Excluded from the proposed Class and Subclass[6] are Plaintiff's counsel, Defendant's officers and directors, and any member of the judiciary presiding over this action. Plaintiff reserves the right to revise the Class and Subclass definitions and to propose additional Subclasses.

62.     As required by Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous

---

[6] Unless otherwise stated herein, references to the "Class" also refers to the "Subclass."

that their individual joinder is impracticable.

63.     As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), commonality and predominance are satisfied because questions of law or fact common to Plaintiff and other Class members predominate over any individual question affecting only individual members, including, for example, as follows:

      a.     Did Facebook's Mobile App generate Stealth Clicks?

      b.     Is the Mobile App designed to autonomously send HTTP GET requests associated with an Ad hyperlink?

      c.     Does Facebook charge Advertisers for Stealth Clicks?

      d.     Does Facebook include Stealth Clicks in user click and engagement data it provides to advertisers about their ad campaigns?

      e.     Do Stealth Click charges constitute a breach of contract?

      f.     Do Stealth Click charges constitute a breach of the implied covenant of good faith and fair dealing?

      g.     Does Facebook's Stealth Click charges violate the California Business and Professional Code, Cal. Bus. Prof. Code § 17200?

      h.     Are Plaintiff and the Class entitled to injunctive relief?

      i.     Are Plaintiff and the Subclass entitled to an accounting under California law?

64.     The claims asserted herein are based on California law which, per Facebook, applies to every member of the Class under the California choice of law provision in Facebook's Terms of Service.[7]

65.     As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of other members of the Class and Subclass.  Plaintiff and all members of the Subclass purchased CPC Ads while Facebook's Stealth Click charge practice was in place.  Plaintiff and other members of the Class published Ads on Facebook on a CPC or CPM basis.

---

[7] https://www.facebook.com/legal/terms/update, last accessed May 24, 2018.

66.     As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no adverse or antagonistic interests to those of the Class and has retained counsel experienced in complex consumer class action litigation.

67.     As required by Fed. R. Civ. P. 23(b)(2), injunctive relief - *e.g.*, Facebook's cessation of the Stealth Click practice - would apply to and benefit the entire Class.

68.     As required by Fed. R. Civ. P. 23(b)(3), a class action is superior to other available means for the fair and efficient adjudication of this controversy.  Each Class member's damages or other financial detriment is relatively small compared to the burden and expense he would incur through individual litigation of the claims against Facebook.  It would be virtually impossible for individuals to obtain effective redress for the wrongs at issue through individual action.  Individualized litigation of these issues would cause delay and expense to all parties and the court system.  By contrast, the class action device provides the benefits of adjudication of these issues in a single court and presents no unusual management difficulties under the circumstances here.  And, Facebook maintains software code used to design the Mobile App used by Plaintiff and the Class, and tracks and records clicks charged, so that class-wide proofs are available.

## CAUSES OF ACTION

69.     The preceding paragraphs are re-alleged and incorporated as if set forth in full in each of the following Causes of Action, which are, to the extent the law or facts permit or require, alleged in the alternative.

### FIRST CAUSE OF ACTION
### Breach of the Contract

70.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein, and brings the First Cause of Action individually and on behalf of the Subclass.

71.     Plaintiff and the Subclass accepted Facebook's offer to purchase CPC Ads on a cost-per-click basis, pursuant to Facebook's standardized terms, promises, conduct, and CPC Ad offer webpages.

72.     Pursuant to the terms of the contract, Facebook published Plaintiff and Subclass member CPC Ads on the Facebook platform, in exchange for their agreement to be charged and have their Payment Instrument debited by Facebook on a Link Click (CPC) basis.

73. At relevant times, Facebook defined "Link Clicks" as "clicks on ad links to select destinations or experiences, on or off Facebook-owned properties" (Advertising Basics, https://www.facebook.com/business/help/659185130844708, last visited May 22, 2018); Facebook explained that link clicks are "one way measure the interest your ad generates among your audience" (*Id.*); and Facebook similarly defined "Link Clicks" as the "number of clicks on links appearing on your ad or Page that direct people off Facebook as a result of your ad" (snapshot of https://www.facebook.com/business/help/659185130844708, entitled, "Link Clicks," dated Sept. 16, 2016, last visited via https://web.archive.org May 22, 2018).

74. Facebook breached the contract because it did not charge Plaintiff and Subclass members for CPC Ads only on a Link Click (CPC) basis, but improperly added Stealth Click charges.

75. Stealth Clicks are not Link Clicks. Stealth Clicks do not click a user through to an Advertiser's web page; Stealth Clicks do not direct users to the Advertiser's linked page; and Stealth Clicks do not measure audience interest.

76. Moreover, that Facebook's terms provide that it "cannot control how clicks are generated on your ads"[8] can only mean that Stealth Clicks, controlled wholly by Facebook, do not count as Link Clicks and therefore should not be charged as Link Clicks.

77. As a result, Plaintiff and the Subclass have been damaged and are owed compensation.

## SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

78. Plaintiff repeats and re-alleges paragraphs 1-69 as if fully set forth herein, and brings the Second Cause of Action individually and on behalf of the Subclass.

79. Plaintiff and the Subclass accepted Facebook's offer and purchased CPC Ads on a cost-per-click basis, pursuant to Facebook's standardized terms, promises, conduct, and CPC Ad offer webpages.

80. The purpose of the contract was to buy user engagement by paying for Ads only

---

[8] *See* note 5, above.

when the user clicks on the embedded Ad link shown to the user.

81.     Pursuant to the contract, Facebook charged their Ad campaigns and unilaterally debited their accounts for charges on a per-click basis.

82.     As part of the contract to sell cost-per-click ads to Plaintiff and the Subclass, Facebook promised, or represented to them, among other things, as follows:

        a.     That Plaintiff and the Subclass can purchase CPC Ads on Facebook.

        b.     That Plaintiff and the Subclass would pay for CPC Ads in proportion to the number of link clicks.

        c.     "When you purchase advertising or promoted posts on or through Facebook, you agree to pay all amounts specified in the order, along with any applicable taxes." (Community Payments Terms applicable to advertiser payments, last visited Dec. 15, 2017).

        d.     "When you run your ad, you'll only be charged for the number of clicks or the number of impressions your ad received." "How you're charged," https://www.facebook.com/business/help/716180208457684?helpref=page_content.

        e.     "CPC (Cost per Link Click)" "shows how much, on average, each link click costs you," and "is calculated as the total amount spent divided by link clicks," which are "[t]he number of clicks on ad links to select destinations or experiences…." (Facebook Advertising Basics, last visited Dec. 17, 2017).

        f.     "You won't be charged for your ad if you chose CPC pricing and it doesn't receive any clicks." (Facebook Advertiser Help Center, last visited Dec. 16, 2017).

83.     As a result, Plaintiff and the Subclass had a right to receive the benefits of their contract – that is, to buy Ads on a cost-per-click basis, and to pay only for engagement by potential customers as quantified by Ad clicks without being charged for Facebook's own Stealth Clicks.

84.     Moreover, as opposed to other types of Facebook advertising transactions, such as CPM advertising where the advertiser pays based on the number of times an Ad is viewed, Facebook' CPC Ads offer the distinguishing benefit of a much more targeted Ad campaign, where

dollars are paid based upon potential customers engaging the Ad—that is, the advertiser agrees to buy CPC Ads in order to pay only for engagement by users who are interested enough to engage or click on the published Ad.

85.     Cost-per-impression or CPM is the default advertising method that Facebook offers to advertisers. Advertisers who use CPC Ads do so only because they have decided to pay more money in exchange for the benefits of an active engagement with a potential customer.

86.     Facebook had an obligation to refrain from doing anything to injure Plaintiff and other Subclass members' right to receive the above-described benefits of the contract.

87.     Facebook authored, published, and controlled all aspects of the operation of the Mobile App.

88.     Facebook fully, directly, and unilaterally controlled how it counted and charged clicks to Plaintiff and the Subclass's Ads.

89.     Facebook does not provide Advertisers details about the clicks that it charges to Plaintiff and Subclass members' Ad campaigns.  Indeed, Facebook performs its side of the contract wholly on its own and does not share details about how or which clicks it has counted or charged. Advertisers must rely on Facebook's discretion and exercise of good faith as it properly calculates, charges, and debits their Payment Instruments for clicks.

90.     Facebook unfairly injured and interfered with Plaintiff's and Subclass members' right to receive contract benefits when Facebook unilaterally, and without notice: (i) included code in the Mobile App that caused it to autonomously perform Stealth Clicks; (ii) counted Stealth Clicks as clicks charged to their CPC ad campaigns; (iii) automatically charged them for Stealth Clicks; (iii) charged for Stealth Clicks when debiting CPC charges from their Ad accounts; (iii) deprived them of engagement by Facebook users on a payable per Link Click basis; (vi) deprived them of a fair share of link clicks charged to and debited from their accounts; or (vii) charged them for Stealth Clicks run counter to the very purpose of the CPC ad, tracking and paying for user engagements. Facebook charges a CPC advertiser for one or more Stealth Clicks regardless of whether or not any Facebook user (or any third-party bot, for that matter) clicks on the link in the Ad.

91.     Facebook's Stealth Click charge-and-debit practice demonstrates it has interpreted the contract terms to permit charges for clicks that Facebook controls.

92.     Facebook's Stealth Clicks occur invisibly to the Mobile App user and charges related thereto are indistinguishable from other clicks for which Advertisers pay through the Ad Manager. In charging for Stealth Clicks, Facebook thus abused its discretionary power to deliver, count, and charge for CPC Ads.

93.     Facebook's writing of computer code into the Mobile App to cause autonomous Stealth Clicks, along with Facebook's computer code that counts those Facebook clicks as chargeable "clicks," resulted in unearned CPC charges levied against Plaintiff and the Subclass's Ad Budgets, in bad faith and frustrating the agreed common purpose of the Facebook Terms and CPC Ad contracts, namely, to pay only for advertising that successfully directed Facebook users to click in the Ad.

94.     Plaintiff and the Subclass complied with substantially all of their obligations under Facebook's terms of the contract including, without limitation, paying amounts for advertising charged by Facebook.

95.     Facebook harmed Plaintiff and the Subclass by charging and debiting their accounts for Ad clicks that did not in-fact occur.

## THIRD CAUSE OF ACTION
### Accounting

96.     Plaintiff repeats and re-alleges the paragraphs 1-69 as if fully set forth herein, and brings the Third Cause of Action individually and on behalf of the Subclass.

97.     Plaintiff and the Subclass accepted Facebook's offer to pay for advertising that was to be priced with the measure of link clicks or engagement by users for whom the advertisements were published.

98.     Due to Facebook's Stealth Click practices, and contrary to the Facebook Terms and applicable law, Plaintiff and other Subclass members paid for CPC Ads which were never "clicked" or engaged by the user, but were autonomously clicked by Facebook's Mobile App.

99.     In the alternative to calculating an estimate or sum certain of resulting damages or

money relief for Plaintiff and the Subclass, the relationship between Plaintiff and the Subclass on the one hand, and Facebook on the other hand, requires an accounting: the balance due to be returned to Plaintiff and the Subclass for monies Facebook took from them for its Stealth Click charging practices can only be ascertained by an accounting from Facebook, and facts needed to ascertain the balance due are known only by Facebook.

100.    Facebook was solely responsible for counting the clicks on a CPC Ad campaign and owed a duty to do so accurately and appropriately. Facebook does not make available its discrete methods for counting clicks it charges to CPC Ad campaigns or for charging for Stealth Clicks and Facebook keeps records of Stealth Clicks and its charges therefore.

101.    Plaintiff and the Subclass share a contractual relationship with Facebook, and the balance of money owed by Facebook to Plaintiff and the Subclass can only be ascertained by an accounting.

102.    In the alternative to other causes pleaded here, absent an accounting, Plaintiff and the Subclass will suffer irreparable harm and will be unable to recover a fair or proper measure of damages or monies paid for Stealth Clicks.

103.    Plaintiff and the Subclass have been harmed and Plaintiff seeks, for himself and the Subclass, an order requiring Facebook to account for all charges imposed for Stealth Clicks, to return monies it improperly debited for Stealth Clicks, and to provide further equitable relief.

**FOURTH CAUSE OF ACTION**
**Violations of the Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**

104.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein, and brings the Fourth Cause of Action individually and on behalf of the Class and Subclass.

105.    Facebook's acts and practices as alleged herein affect the general public and constitute fraudulent, unlawful, and unfair business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

***Fraudulent Conduct -***
***Inflated Charges***

106.    Plaintiff and the Subclass purchased Facebook's CPC Ads at relevant times.

107.    Facebook failed to disclose to Plaintiff and the Subclass—at the time they initiated their Ad campaigns, at the time of Ad purchase, indeed at any relevant times, and via Facebook's website disclosures—that they would be charged for clicks autonomously generated by Facebook's Mobile App.

108.    Plaintiff reasonably relied upon Defendant's representations of the number of clicks charged to his Ad campaigns, without being told that a portion of those click charges are attributable to Stealth Clicks.

109.    Neither the Facebook Terms, nor Facebook's Ad Manager or other Facebook tools for Advertisers disclose that that Advertisers will incur CPC charges for the Stealth Clicks.

110.    Facebook's Stealth Clicks occur invisibly to the Mobile App user, and charges that Facebook imposes on Advertisers for these pre-fetch clicks are indistinguishable from charges for other Ad clicks displayed via Facebook's Ad Manager or data analytics.

111.    Members of the public are likely to be deceived by Facebook above-described acts and omissions.

112.    Plaintiff reasonably relied upon Facebook's above-described omissions and concealment, and Facebook's presentation of its CPC fee structure which nowhere referenced the Stealth Clicks, when he placed and purchased CPC Ads at relevant times when Facebook Stealth Click practice was in place.

113.    Had Plaintiff known of the above-described omissions, Plaintiff would have paid less for his Ads or would not have paid for the improper Stealth Click charges.

114.    As a result, Facebook's conduct violates the UCL's prohibition against "fraudulent" conduct, Cal. Bus. and Prof. Code § 17200 *et seq.*

### *Unlawful Conduct*

115.    Facebook's systematic breach of the covenant of good faith and fair dealing implied by the Facebook terms constitutes an unlawful business practice.

116.    Alternatively, the terms for the purchase of CPC Ads as set forth above constitute a contract that Facebook breached by charging and debiting money from Plaintiff and the Subclass for Stealth Click charges and causing them resulting money damages.

117.   As a result, Facebook's conduct violates the UCL's prohibition against "unlawful" conduct, Cal. Bus. and Prof. Code § 17200 *et seq*.

### *Unfair Conduct*

118.   In the alternative, Facebook's conduct, as alleged herein, is oppressive, immoral, unethical, and unscrupulous, caused Plaintiff and the Class substantial injury, and violates public policy, in violation of the UCL's prohibition against "unfair" conduct, Cal. Bus. and Prof. Code § 17200 *et seq*.

119.   At all relevant times, Facebook was the author and publisher of the Mobile App.

120.   Software functions written into the Mobile App by Facebook caused the Mobile App to perform Stealth Clicks, invisibly and unbeknownst to Plaintiff.

121.   Any utility of Facebook's conduct, for Advertisers, in authoring and publishing the Mobile App to generate unearned and unwarranted Stealth Clicks is outweighed by the economic injury it caused to Plaintiff and other Advertisers; and no countervailing benefit outweighs the gross injustice of imposing Stealth Click charges and providing inflated click data at will.

122.   The breadth of Stealth Click charges, as a material portion of clicks charged by Facebook on CPC campaigns, caused Plaintiff and the Subclass substantial injury.

123.   Moreover, the Ad metrics—specifically, link click metrics—Facebook provides to Plaintiff and the Class as part of their Ad purchases, in turn provides valuable information to Plaintiff and the Class about the effectiveness of the links included in their Ads, and informs future Advertiser advertising, business and budget decisions.  At relevant times, Plaintiff received, reviewed, or relied upon the inflated or corrupted click data provided by Facebook for the purpose of making advertising decisions,

124.   Discovery of the conduct at issue requires significant technical know-how. Plaintiff had no meaningful way to avoid the economic injury he suffered as a result of Facebook's unfair conduct.

125.   As a result of Facebook's fraudulent, unlawful, and unfair conduct in violation of the UCL, Plaintiff and other Class and Subclass members were injured in fact, lost money or property, paid for Stealth Clicks wrongly charged and automatically debited by Facebook, and

paid for Ads which, as part of their Ad purchases, included Facebook inflated and corrupted Ad performance metrics.

126.     Plaintiff and the Class and Subclass are also entitled to additional equitable and injunctive relief, including an order enjoining Facebook from continuing to charge for Stealth Clicks, an order requiring Facebook to provide an accounting of Stealth Clicks applied to Advertiser CPC Ad charges and Facebook Ad data, and an order enjoining Facebook from providing ad click data unless it excludes, segregates or otherwise properly accounts for Stealth Clicks.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays that the Court grant judgment against Defendant and provide the following relief:

**A.** Certify this case as a class action, and appoint Plaintiff as class representative and Plaintiff's counsel as class counsel;

**B.** Find and declare that Defendant's above-described conduct violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and California law as set forth herein;

**C.** Issue injunctive and other equitable relief available under all applicable law, including, *inter alia*: (i) an order enjoining Defendant from providing Ad click data unless it excludes, segregates, or otherwise properly accounts for Stealth Clicks; (ii) an order prohibiting Defendant from continuing to engage in the above-described wrongful conduct and continuing to charge for Stealth Clicks (absent proper disclosures); (iii) an order requiring Defendant to provide an accounting of Stealth Clicks and Stealth Click charges generated for Advertiser CPC Ad campaigns; (iv) and an order requiring Defendant to more-clearly define the categories of clicks for which it charges Advertisers on a CPC basis;

**D.** Award damages, restitution, or restitutionary disgorgement of monies Defendant unlawfully obtained from Plaintiff and the Class as a result of its aforementioned conduct;

**E.** Establish a constructive trust, for the benefit of Plaintiff, the Class and Subclass consisting

1   of monies Facebook improperly collected due to its Stealth Click practices;

2   **F.**  Award Plaintiff reasonable litigation expenses and attorneys' fees under applicable law

3   including Cal. Civ. Code § 1021.5; and

4   **G.**  Provide such other and further relief as equity and justice may require.

5   **JURY DEMAND**

6   Plaintiff demands a jury trial as to all matters so triable.

7

8   DATED:     May 24, 2018

9   Respectfully submitted,

10   Tony Kramer, individually and on behalf of all other similarly situated

11   By: /s/ Kathryn S. Diemer
          One of Plaintiff's Counsel

12

13   Kathryn S. Diemer
      Diemer & Wei, LLP

14   100 West San Fernando St. Ste. 555
      San Jose, CA 95113

15   P: 408-971-6270
      F: 408-971-6271

16   kdiemer@diemerwei.com

17   Phillip A. Bock (pro hac vice to be requested)
      Daniel J. Cohen (pro hac vice to be requested)

18   Molly S. Gantman (pro hac vice to be requested)
      Bock, Hatch, Lewis & Oppenheim, LLC

19   134 N La Salle St. Ste. 1000
      Chicago, IL 60602

20   P: 312-658-5500
      F: 312-658-5555

21

22   Ilan Chorowsky (pro hac vice to be requested)
      Mark Bulgarelli (pro hac vice to be requested)

23   Adam Urbanczyk, *Of Counsel* (pro hac vice to be requested)
      Progressive Law Group, LLC

24   1570 Oak Ave., Ste. 103
      Evanston, IL 60201

25   P: 312-787-2717
      F: 888-574-9038

26

27

28